UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PARCHEM TRADING, LTD.,

                              Plaintiff,

            v.

KRISTEN DEPERSIA,

                              Defendant.

No. 17-CV-1618 (KMK)

OPINION & ORDER

Appearances:

Adam Steward Katz, Esq.
Goldberg Segalla, LLP
New York, NY
*Counsel for Plaintiff*

Glenn Alan Duhl, Esq.
Hugh Walz Cuthbertson, Esq.
Zangari Cohn Cuthbertson Duhl & Grello PC
New Haven, CT
*Counsels for Defendant*

KENNETH M. KARAS, United States District Judge:

     Parchem Trading, Ltd. ("Plaintiff") brings this Action against Kristen DePersia

("Defendant"), one of its former employees, alleging misappropriation of trade secrets. (*See*

*generally* Am. Compl. (Dkt. No. 10); *see also* Not. of Removal 1 (Dkt. No. 1).)  Specifically,

Plaintiff alleges that Defendant, now employed by one of Plaintiff's business competitors, used

trade secrets to facilitate sales of chemical products to Bristol-Myers Squibb Company ("BMS"),

who also does business with Plaintiff, and that Defendant misappropriated Plaintiff's proprietary

business information via her personal cellphone.  Currently before the Court is Defendant's

Motion for Summary Judgment.  (*See* Not. of Mot. (Dkt. No. 66).)  For the reasons discussed below, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' Rule 56.1 Statements and Counterstatements.[1]  (*See* Def.'s 56.1 Statement in Supp. of Mot. ("Def.'s 56.1"); Pl.'s 56.1

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that

Counter Statement to Def.'s 56.1 ("Pl.'s Counter 56.1"); Pl.'s 56.1 Statement in Opp'n to Mot.

("Pl.'s 56.1"); Def.'s Counter Statement to Pl.'s 56.1 ("Def.'s Counter 56.1"); Def.'s Reply 56.1

Statement in Supp. of Mot. ("Def.'s Reply 56.1") (Dkt. Nos. 69, 80, 87).)

    Plaintiff is a New York technology sourcing and marketing company in the raw material

space that engages in trading and distributing of bulk specialty chemicals. (Pl.'s 56.1 ¶ 1.)[2]

Plaintiff does not itself manufacture any of the chemicals it sells, but rather sources them and

provides them to various clients who need them for their own businesses. (Def.'s 56.1 ¶ 18.)[3]

According to Plaintiff, it best services its customers through a compilation of "proprietary

technology," including "databases, algorithms, and control panels" that contain information

concerning "customers, customer preferences, products, suppliers, marketing strategies, and

pricing." (Pl.'s 56.1 ¶ 2.) The "compilation" of this information is not generally available to the

public. (*Id*.) Plaintiff claims it has spent over eight years and millions of dollars developing its

industry knowledge regarding its customer preferences and related data. (*Id*. ¶¶ 3–5.) Plaintiff

uses some security measures to keep this information secret, such as a two-party authentication

---

"responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)).

    Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

    [2] Plaintiff included both its own 56.1 Statement and its responses to Defendant's 56.1 Statement in one document. (*See* Dkt. No. 80.) To avoid confusion, the Court cites to native paragraph numbering, referring to the facts in Plaintiff's 56.1 as "Pl.'s 56.1" and Plaintiff's responses to Defendant's 56.1 as "Pl.'s Counter 56.1." Plaintiff's 56.1 begins at page 45 of the document. (*See id*. at 45.)

    [3] Plaintiff purports to dispute this characterization of its business, but points only to an excerpt of a transcript that does not indicate that *Plaintiff* manufactures any drugs; rather, it references *BMS's* "R&D development stages for numerous pharmaceutical-related products." (Decl. of Adam S. Katz, Esq. in Opp'n to Mot. ("Katz Decl.") Ex. C ("Pl.'s Goldstein Dep. Tr. Excerpt") 91 (Dkt. No. 79-3); *see also* Pl.'s Counter 56.1 ¶ 18.)

method with rotating passwords, as well as limiting the availability of some of this information

to "certain managers with nested permissions." (*Id.* ¶¶ 6–7.) Plaintiff also requires its

employees to sign a confidentiality agreement and review employee handbooks, which explain

that compiled information, including customer lists, preferences, and strategies, should be kept

confidential. (*Id.* ¶ 8.)

BMS has had a business relationship with Plaintiff since 2001. (*Id.* ¶ 9.) BMS first

purchased materials through Plaintiff in 2005. (*Id.*) According to Plaintiff, over the years, it has

built "a good relationship with BMS" and believes that, "as with most commodities" supplying

relationships, "pricing was and is clearly a factor in winning over BMS's business." (*Id.* ¶ 10.)

Defendant contests that pricing of supplies was important to BMS; in doing so, she points to a

statement by Ephraim Rabin ("Rabin"), Plaintiff's President, saying "We don't sell on price.

This is not about price. We're the most expensive. We are boutique . . . ." (Decl. of Hugh W.

Cuthbertson, Esq. in Supp. of Mot. ("Cuthbertson Decl.") Ex. C ("Def.'s Rabin Dep. Tr.

Excerpt") 125 (Dkt. No. 70-4).)

Plaintiff hired Defendant in October 2011 as a technical sales associate. (Def.'s 56.1

¶ 3.) In this role, Defendant worked to identify potential customers that might have a need for

chemicals, (*id.* ¶ 6), and to maintain existing accounts, (Katz Decl. Ex. A ("Pl.'s Def. Dep. Tr.

Excerpt") 14 (Dkt. No. 79-1)). In October 2014, Defendant's job position was changed to "key

account manager." (Pl.'s 56.1 ¶ 20.) Defendant worked for Plaintiff for nearly five years and

ultimately resigned on April 28, 2016. (Def.'s 56.1 ¶ 4.) On May 9, 2016, Defendant began

working at a company known as Charkit, one of Plaintiff's competitors. (*Id.* ¶ 5.)

Although it is undisputed that Defendant used her personal cellphone for some business

matters, (Def.'s 56.1 ¶ 11), the Parties dispute the circumstances under which Defendant began

doing so and the extent to which she used her personal phone for business matters. Defendant

claims that Plaintiff did not provide her with a company cellphone when she first began working,

and that she was "required" to use her personal cell as her work phone, on which she allegedly

"saved at most only a handful of business contacts." (Cuthbertson Decl. Ex. F ("Def.'s Decl.")

¶¶ 21–22 (Dkt. No. 70-11).) Plaintiff claims that Defendant was given the choice of whether she

wanted to use her personal cellphone or be issued a work cellphone when she started her

employment with Plaintiff. (Pl.'s 56.1 ¶ 14 (citing to Rabin Decl. in Opp'n to Mot. ("Rabin

Decl.") ¶ 17 (Dkt. No. 78)).) Defendant claims that, to the extent she used her personal cell

phone for work, she generally preferred to search within her business e-mail for any contact

information instead of "clutter[ing]" her personal phone with business contacts. (Def.'s Decl.

¶ 22.) Therefore, according to Defendant, most relevant business information was segregated

into her work e-mail on her personal cellphone and not integrated into other applications or

functions on her personal phone. (*See id.*) After a few years, Plaintiff gave Defendant a

company cellphone. (Def.'s 56.1 ¶ 13.) However, Plaintiff claims that, in January 2016,

Defendant turned in her company cellphone and therefore used her personal cellphone for work

purposes for approximately four months before she resigned. (Pl.'s 56.1 ¶ 31 (citing to Rabin

Decl. ¶¶ 34–35).)

When Defendant became a key account manager in 2014, Plaintiff, as part of her new

role, gave Defendant access to lists of existing customer accounts and their contact information,

along with the customers' "preference history," information which Plaintiff claims is

"proprietary" and included information pertaining to BMS. (*Id.* ¶ 21.) Following a purported

leakage of confidential business information in an unrelated incident involving another former

employee, (*see id*. ¶¶ 23–26), Rabin met with Defendant and asked her to sign a non-compete agreement in the event she left the company, which Defendant refused to do, (*id*. ¶ 29).

On March 9, 2016, Defendant asked Michael Wolf ("Wolf"), Plaintiff's Director of Operations, for a report detailing the historical sales, listed by product, that were sold to BMS. (*Id*. ¶ 33.) According to Plaintiff, Defendant did not typically have access to this kind of information, and this type of request was "unprecedented." (*Id*. (citing to Def.'s Decl. ¶ 20; Rabin Decl. ¶ 36; Pl.'s Goldstein Dep. Tr. Excerpt 35, 41, 118–19).) Defendant claims that she did have access to the underlying data, but she asked Wolf to compile the list because he was able to access a database that "would allow him to create the list in less than 6 minutes." (Def.'s Counter 56.1 ¶ 33.)[4] Moreover, Defendant claims she asked for this list in preparation for a meeting sponsored by the Drug, Chemical & Associated Technologies Association ("DCAT"), which Defendant attended to market Plaintiff's services to current and prospective customers. (Def.'s 56.1 ¶ 33.) According to Defendant, she asked for and brought the list because she believed that it would be helpful to provide existing customers, such as BMS, with an overview of the business they had done together. (*Id*. ¶ 34.) Defendant claims she brought the list to the DCAT meeting, gave it to a BMS representative, and kept no copy for herself. (*Id*. ¶ 35.) In support of this, Defendant submits a declaration from Elias Mattas ("Mattas"), the former BMS employee to whom she gave the comprehensive list. (*See generally* Cuthbertson Suppl. Decl. in Supp. of Mot. ("Cuthbertson Suppl. Decl.") Ex. J ("Mattas Decl.") (Dkt. No. 86-9).) In it, Mattas writes that he recalls that, at a DCAT meeting in March 2016, Defendant gave him a

---

[4] Defendant includes both Replies to Plaintiff's Counter 56.1 and Responses to Plaintiff's 56.1 Statement in the same document. (*See* Dkt. No. 87.) When referring to Defendant's Responses to Plaintiff's 56.1 Statement, the Court cites to "Def.'s Counter 56.1." Defendant's Counter 56.1 begins on page 30 of the document. When referring to Replies to Plaintiff's Counter 56.1, the Court cites to "Def.'s Reply 56.1."

document that showed him BMS's purchase history with Plaintiff's company. (*Id*. ¶ 6.) After reviewing it, he took it with him, and when he left BMS, he "securely disposed" of all his files, including this document. (*Id*. ¶ 7.) Plaintiff simply maintains that Defendant "never returned" this list to Wolf or to any other employee at Plaintiff. (Pl.'s 56.1 ¶ 35.)

After Defendant provided notice to Plaintiff that she would be leaving her job in April 2016, Defendant met with Jacob Klein ("Klein"), Plaintiff's Senior Compliance Officer, who conducted a termination procedure. (*Id*. ¶ 37.) Klein conducted this procedure in order to ensure that Defendant would leave "without causing any damage to [Plaintiff] and without being able to access [Plaintiff's] proprietary information." (*Id*. ¶ 38.) Klein deleted Defendant's work e-mail account and scanned Defendant's photos to see if any sensitive screen shots were retained on her phone. (*Id*. ¶ 39.) According to Plaintiff, this process takes, on average, three to five minutes, a metric that Defendant can neither confirm or deny. (*Id*.; *see also* Def.'s Counter 56.1 ¶ 39.)

On April 26, 2016, Defendant changed her profile on the social media website, LinkedIn, to reflect the fact that she was now employed by Charkit. (Pl.'s 56.1 ¶ 41.) Shortly afterwards, George Gossett ("Gossett"), a representative for BMS and Defendant's professional acquaintance, messaged her, and wrote, "You can't leave Parchem! This is unacceptable." (Def.'s Decl. Attachment 3 ("Gossett LinkedIn Message") (Dkt. No. 70-14).) In response, Defendant wrote, "George, I am so sorry. I didn't get to contact you . . . . I gave my notice yesterday morning and was out the door shortly after. It was an absolute pleasure working with you. I will be starting at Charkit in Newark, CT on May 9th. Please contact me if there is anything I can help with . . . and hope to talk soon." (*Id*.) Gossett responded, "Good luck with your new position. Maybe you can setup a meeting to show what Charkit has to offer. Keep in touch." (*Id*.)

Defendant and Gossett arranged a meeting, which occurred within one to two months following the LinkedIn message exchange.  (Pl.'s 56.1 ¶ 45.)  Defendant characterizes this meeting as a response to Gossett's invitation to stay in touch via LinkedIn, (*see* Def.'s Counter 56.1 ¶ 45), whereas Plaintiff characterizes it as Defendant soliciting Gossett (and BMS's) business, (Pl.'s 56.1 ¶¶ 44–45).  Prior to this meeting with Defendant, Gossett had never purchased products from Charkit.  (Pl.'s 56.1 ¶ 46.)  Plaintiff claims that Charkit was "in an entirely different business and had not sold in this realm of ingredients before."  (Pl.'s 56.1 ¶ 47.)  Bryant Hinnant ("Hinnant"), the General Counsel of Charkit, (Cuthbertson Suppl. Decl. Ex. H ("Hinnant Decl.") ¶ 2 (Dkt. No. 86-6)), clarified that Charkit does not sell active pharmaceutical ingredients, or "APIs"; instead, Charkit usually sells intermediate chemicals to companies "that work in the drug field or intermediates," (Katz Decl. Ex. F ("Pl.'s Hinnant Dep. Tr. Excerpt") 35 (Dkt. No. 79-6)).  Hinnant declared that, prior to Defendant's employment with Charkit, Charkit "already had a well-established customer and supply base" for *intermediate* chemicals, which are non-API chemicals that are "used to make other chemicals, including APIs."  (Hinnant Decl. ¶ 5.)  Hinnant also testified that although Charkit was "looking to expand into API[s]," they were not selling and have not sold any APIs to BMS.  (Pl.'s Hinnant Dep. Tr. Excerpt 35.)  According to Hinnant, suppliers of intermediate chemicals "are publicly available and well known to distributors and end users in the chemical industry," and, following Defendant's arrival at Charkit, BMS proceeded to use Charkit primarily "to purchase mostly different *intermediate* chemicals."  (Hinnant Decl. ¶ 5 (emphasis added).)  Hinnant clarified that although he testified that Charkit may be "looking to expand into API[s]," he meant that Charkit "is always looking to expand its product line," (*id*. ¶ 9), and this was not a reference to Defendant's relationship with

BMS, as she has only sold intermediate chemicals and not APIs to BMS while at Charkit, (*id.* ¶ 11).

Plaintiff claims that, at the meeting with Gossett, Defendant presented him with information regarding "the exact products that were on the proprietary list that Defendant[] requested from [] Wolf" prior to her departure from Plaintiff. (Pl.'s 56.1 ¶ 49.) To support this allegation, Plaintiff points to excerpts of Gossett's deposition, where Gossett says, of the meeting in question, that Defendant "showed [him] Charkit's business model[] . . . and the services they provide," along with product categories that Charkit could provide to BMS. (Katz Decl. Ex. E ("Pl.'s Gossett Dep. Tr. Excerpt") 22–23 (Dkt. No. 79-5).) According to Gossett, he began purchasing some products from Charkit because there was now a "[d]ifferent pipeline for BMS [with] different needs" and because Defendant "provides better customer service." (*Id.* at 27.)[5] However, Gossett also testified that he was not necessarily dissatisfied with Plaintiff's business, either. (Pl.'s 56.1 ¶ 50 (citing Pl.'s Goldstein Dep. Tr. Excerpt 65–66).) Defendant testified that, after cross-checking the product lists of her sales to BMS while working for Plaintiff against her sales to BMS while working at Charkit, there were a total of six products that overlapped. (Cuthbertson Suppl. Decl. Ex. A ("Def.'s Suppl. Def. Dep. Tr. Excerpt") 163 (Dkt. No. 86-1).) Defendant also testified that for each of these products and for each sale to BMS, BMS had "reached out to [Defendant] for the product." (*Id.*)

According to Rabin, Plaintiff has lost "approximately $600,000 profit per year with a year over year growth of 15% in sales to Charkit since Defendant left." (Rabin Decl. ¶ 39.) However, Plaintiff does not specify how much of this loss corresponds to the types and amounts

---

[5] Gossett also testified that Defendant was "the best chemical rep" that he dealt with, due to her "[r]esponsiveness, agility[,] and speed." (*Id.* at 16.)

of sales that Defendant made to BMS while at Charkit or to the six products that overlapped between Defendant's portfolio of sales to BMS while at Plaintiff and her portfolio of sales to BMS while at Charkit.[6]  Based on the foregoing, Plaintiff claims that Defendant misappropriated Plaintiff's trade secrets while working at her new job at Charkit.

### B.  Procedural Background

Plaintiff first filed its Complaint in state court on February 3, 2017.  (*See* Compl. (Dkt. No. 1-1).)  On March 3, 2017, Defendant removed the Action to this Court on diversity grounds.  (*See generally* Not. for Removal.)  The Court held a Show Cause Hearing, where it denied Plaintiff's Application for a temporary restraining order and preliminary injunction without prejudice.  (*See* Order (Dkt. No. 8); Dkt. (minute entry for Mar. 7, 2017).)  Plaintiff then filed its Amended Complaint on March 14, 2017.  (*See* Am. Compl.)  Defendant Answered on April 13, 2017.  (*See* Ans. (Dkt. No. 17).)  On October 17, 2017, Plaintiff's counsel at the time wrote a letter to the Court indicating that he wished to withdraw as Plaintiff's counsel.  (*See* Dkt. No. 42.)  In response, the Court stayed the case for 60 days so that Plaintiff could seek other counsel.  (*See* Dkt. No. 43.)  The Action was stayed, (*see* Dkt. (entry for Oct. 18, 2017)), but through inadvertence or clerical error, the case remained designated as "stayed" on ECF, even though

---

[6] Plaintiff also claims, based on three e-mail chains that Plaintiff inadvertently received from customers who meant to email Defendant's new Charkit e-mail address, that it saw communications "concerning the sourcing of certain product that [Plaintiff] supplies to its customers."  (Pl.'s 56.1 ¶¶ 55–56.)  Some of the referenced e-mails are attached as Exhibits G and H to the Rabin Declaration.  (*See* Rabin Decl. Ex. G ("Feb. 2017 E-mail Chain"); Ex. H ("Mar. 2017 E-mail Chain") (Dkt. Nos. 78-7–8).)

Plaintiff obtained new counsel, who appeared on the record on November 7, 2017, (*see* Dkt. No. 44).

On June 7, 2018, the Parties signed a Stipulation limiting the claims at issue to only the allegations regarding Defendant's wrongdoing as to sales of chemicals to BMS while employed at Charkit and Defendant's use of Plaintiff's proprietary business information through her personal cellphone. (Dkt. No. 57.) A Pre-Motion Conference was held on July 13, 2018, where the Court adopted a briefing schedule for the instant Motion. (Dkt. (minute entry for July 13, 2018)).

Defendant filed its moving papers on September 14, 2018. (*See* Not. of Mot.; Cuthbertson Decl.; Def.'s 56.1; Def.'s Mem. of Law. in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 67).) On September 18, 2018, Defendant's counsel wrote a letter to the Court indicating its intent to file a motion for Rule 11 sanctions against Plaintiff's counsel for continuing to pursue a purportedly frivolous litigation. (Dkt. No. 71.) The Court indicated that the Parties should wait until the case was fully litigated to file any Rule 11 motion on these grounds. (Dkt. No. 75.) Plaintiff filed its opposition papers on November 2, 2018, including some sealed documents that were sent to chambers. (Rabin Decl.; Katz Decl.; Pl.'s 56.1; Pl.'s Counter 56.1; Pl.'s Mem. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 77); Dkt. (entry for Nov. 5, 2018).) Defendant filed its reply papers on December 3, 2018. (Cuthbertson Suppl. Decl.; Def.'s Reply 56.1; Def.'s Counter 56.1; Def.'s Reply Mem. in Supp. of Mot. ("Def.'s Reply Mem." ) (Dkt. No. 85).)[7]

---

[7] The Court also notes that Magistrate Judge Paul E. Davison ("Judge Davison") ordered Plaintiff to pay Defendant $10,000 in sanctions due to Rabin's troublingly unproductive and disruptive behavior at his depositions for this Action. A more detailed account of the facts and circumstances leading to this imposition can be found in Judge Davison's Decision and Order. (*See generally* Judge Davison Decision & Order (Dkt. No. 88).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (quotation marks omitted). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

B.  Applicable Law

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (alteration and quotation marks omitted). "To

14

succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).[8]  Damages are measured "either by the plaintiff's losses, or by the profits unjustly received by the defendant." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) (citations omitted).

In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Faiveley Transp.*, 559 F.3d at 117 (quotation marks omitted).  Furthermore, "confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009).  Generally, the "existence of a trade secret is a question of fact." *Big Vision*, 1 F. Supp. 3d at 267 (quotation marks omitted).

However, generally, "[i]n the absence of a restrictive covenant, an employee may freely compete with a former employer *unless* trade secrets are involved or fraudulent methods are

---

[8] The Parties assume that New York law governs this dispute.  The Court will do the same. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (alteration and quotation marks omitted)); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) ("Because both parties agree that New York cases are controlling, we shall assume that New York law governs this diversity action.").

employed." *Pearlgreen Crop. v. Yau Chi Chu*, 778 N.Y.S. 2d 516 (App. Div. 2004) (emphasis added) (quotation marks omitted). "Solicitation of an employer's customers by a former employee through the use of a customer list is not actionable unless the customer list is [itself] considered a trade secret or there was wrongful conduct such as physically taking or copying the employer's files or using confidential information." *E. Bus. Sys. Inc. v. Specialty Bus. Sols., LLC*, 739 N.Y.S.2d 177, 179 (App. Div. 2002) (citation omitted).

### C. Application

Defendant principally argues that discovery has failed to put forth any admissible evidence that Defendant misappropriated any trade secret information through her communications with BMS or through the use of her personal cellphone. (*See generally* Def.'s Mem.) Plaintiff principally argues that, although the evidence produced may be circumstantial, the purportedly suspicious circumstances under which Defendant won over BMS's business should be enough to establish a genuine dispute of material fact and survive summary judgment. (*See generally* Pl.'s Mem.)

#### 1. Defendant's Business Relationship with BMS

At the outset, it is important to note that Defendant never signed a non-compete or non-solicitation clause or agreement during her employment with Plaintiff. At the Show Cause Hearing, Plaintiff conceded that Defendant could, by the terms of her employment with Plaintiff, leave and "go work for a competitor." (Dkt. No. 71 Ex. A ("Hr'g Tr.") 8 (Dkt. No. 71-1).) Moreover, Plaintiff also stated that it would amend its Complaint to rely on misappropriation of trade secrets rather than a contractual duty to keep certain information secret. (*Id*. at 10.) The Amended Complaint, when filed, did indeed substitute a misappropriation of trade secrets claim for the original breach of contract claim. (*Compare* Compl. ¶¶ 25–28 *with* Am. Compl. ¶¶ 40–

44.)  Plaintiff makes much of the LinkedIn message exchange between Defendant and Gossett, arguing that it is at the very least unclear who solicited whom.  (*See* Pl.'s Mem. 29.)  However, this argument is largely irrelevant as "[s]olicitation of an employer's customers by a former employee is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee . . . ."  *Amana Express Int'l, Inc. v. Pier-Air Int'l, Ltd.*, 621 N.Y.S.2d 108, 109 (App. Div. 1995) (collecting cases).  Therefore, even if the record indisputably showed that Defendant solicited BMS's business through Gossett while at her new position at Charkit, this *alone* does not establish misappropriation of a trade secret.  To the extent Plaintiff relies on the argument that Defendant's social media exchange with Gossett—even if it can be characterized as "solicitation"—somehow *proves* misappropriation of trade secrets, it is tautological.  (*See* Gossett LinkedIn Message.)  Given that Plaintiff has acknowledged that Defendant "refused to sign a non-compete agreement" and has not alleged or shown the existence of any other sort of contractual obligation not to engage with customers she previously worked with while employed by Plaintiff, Defendant did not breach any duty simply by reconnecting with Gossett alone.  (Pl.'s Counter 56.1 ¶ 43.)[9]  Therefore, the relevant question is whether there is a genuine dispute of material fact as to whether Defendant engaged in the use of Plaintiff's trade secrets or other "wrongful conduct" when purportedly soliciting and/or securing BMS's business relationship with her new employer, Charkit.  *See Amana*, 621 N.Y.S. 2d at 109 (citations omitted).

Plaintiff argues that the "list of BMS's purchase history" with Plaintiff constitutes the trade secret information that Defendant purportedly misappropriated and used to usurp BMS's

---

[9] Nor does the exchange itself include the discussion of any of Plaintiff's proprietary business information or anything that could come close to being characterized as such.  (*See* Gossett LinkedIn Message.)

business from Plaintiff. (Pl.'s Mem. 16.) It is true that, under some circumstances, "[a] customer list that contains information such as the identities and preferences of client contacts" may be a "protectable trade secret." *In re Cross Marketing Corp.*, No. 06-CV-4228, 2006 WL 2337177, at *4 (S.D.N.Y. Aug. 11, 2006) (citations omitted). A trade secret may exist "in a *combination* of characteristics and components, each of which, by itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage." *Id*. (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)) (emphasis added). However, in such circumstances, although a comprehensive "list," perhaps "developed through a substantial effort spanning many years," constitutes a trade secret, *elements* of the list, such as "customer addresses" in the public domain are *not*, *id*., unless the "the customers are not known . . . or are discoverable only by extraordinary efforts," *Leo Silfen, Inc. v. Cream*, 278 N.E.2d 636, 639–40 (N.Y. 1972) ("Generally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his [former] employer's customers." (collecting cases)); *see also Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 566–67 (S.D.N.Y. 2016) (finding that the plaintiff company's client list and pricing information were not trade secrets because the customers were well-known, with contact information that was "readily ascertainable" through the internet and through general phone calls, and the plaintiff company failed to provide evidence that it priced or sourced on the basis of any "proprietary formula that gives it a unique advantage" (citations omitted)); *TNS Media Research v. TRA Global, Inc.*, 977 F. Supp. 2d 281, 313 (S.D.N.Y. 2013) ("A client list may be a trade secret under New York law; however, a client list created through widespread canvassing of an obvious

and highly competitive market, is insufficient to warrant trade secret protection." (citations and quotation marks omitted)).[10]

According to Plaintiff, the list that summarized its comprehensive sales history with BMS constituted a trade secret. (*See* Pl.'s Mem. 12–13.) The Parties dispute the level of secrecy with which Plaintiff treated the data comprising the summary list; according to Plaintiff, only senior employees like Wolf had access to the information, (*id*. at 6), while Defendant claims she only asked Wolf to prepare the list because he had access to a database that would allow him to compile it much faster than she could, (Def.'s Counter 56.1 ¶ 33). Plaintiff principally contends that it is at least debatable whether the list constitutes a trade secret, and, because this is generally a "question of fact," the Action as a whole should survive summary judgment. *Big Vision*, 1 F. Supp. 3d at 267 (quotation marks omitted).

However, Plaintiff's argument misses the bigger picture. Even assuming that the BMS purchase history list constitutes a trade secret—or that at least a genuine issue of fact exists as to whether it does—there is simply no evidence on the record that Defendant misappropriated that list to secure BMS's business while at Charkit. In fact, all the evidence points to the contrary. For example, Defendant affirmed that she asked for the summary list shortly before her departure from her employment with Plaintiff, but she also affirmed that she only used it while she was

---

[10] Therefore, there are some serious questions as to whether any of Plaintiff's customer contacts would constitute a trade secret at all. Indeed, Defendant has affirmed that she generally "used publicly available information sources on the [i]nternet" to search for new contacts and "call[ed] on them cold" when she worked for Plaintiff. (Def.'s Decl. ¶ 6.) Nevertheless, the Court does not and need not address the question of whether Plaintiff's customer contacts constitute trade secrets, as Plaintiff claims that Defendant misappropriated a product purchase history list (which the record fails to support, as discussed below). Moreover, the record indicates that Defendant and BMS reconnected through a public forum, and Defendant did not (and did not need to) use any purportedly confidential contact list to secure a meeting with her former contact at BMS.

still employed by Plaintiff at a DCAT meeting to educate a BMS representative on his company's purchase history with Plaintiff. (Def.'s Decl. ¶ 20.) The BMS representative to whom Defendant spoke at the DCAT meeting—a non-party to this Action, and no longer employed at BMS—submitted a Declaration affirming under penalty of perjury that he recalled meeting Defendant, recalled discussing the purchase history with Defendant, which served as a "useful guide" for discussion, and recalled leaving the meeting with the list at issue. (Mattas Decl. ¶¶ 6–7.) That representative also affirmed that he never returned the list to Defendant and that the list was destroyed, along with his other confidential papers, when he left BMS. (*Id.* ¶ 7.) Indeed, Plaintiff does not—and cannot—refute any of this. It simply repeats the undisputed fact that the list was never returned to Plaintiff, (Pl.'s Mem. 6; Pl.'s 56.1 ¶ 33), a fact that is corroborated by Defendant's account of events and by the information submitted by Mattas. Plaintiff provides no evidence at all indicating how Defendant subsequently misappropriated the summary list despite giving it to BMS at the DCAT meeting. Nor does Plaintiff allege that Defendant misappropriated any other form of trade secret when reconnecting with BMS at Charkit, which, at this stage in the litigation, should already have been raised (if present at all). *See Big Vision*, 1 F. Supp. 3d at 264–66, n.48 (holding that vague allegations of what plaintiff's trade secret actually was were "not sufficiently particular" and collecting cases where courts had condemned plaintiffs for failing to specify what trade secret they alleged was improperly disclosed and/or misappropriated); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 819 (S.D.N.Y. 2008) (noting that, at summary judgment, a defendant in a trade secret case "is entitled to know at some point . . . the precise trade secrets [the plaintiff] is asserting were misappropriated," and that, "after almost a year of discovery the plaintiff . . . should identify the

precise trade secrets it alleged were misappropriated" (describing *Xerox Corp. v. Int'l Bus. Machs. Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974)) (citations omitted)).

Indeed, Gossett, the BMS representative who met with Defendant after she started working at Charkit, testified that, at the meeting between Gossett and Defendant, Defendant presented "Charkit's business model, . . . and the services [Charkit] provide[s]." (Def.'s Gossett Dep. Tr. Excerpt 22.) Despite Plaintiff's bald assertion that Defendant presented Gossett with information about "the *exact* products that were on the proprietary list that Defendant requested from [] Wolf only weeks before her departure," (Pl.'s Mem. 7 (emphasis added); *see also* Pl.'s 56.1 ¶ 49), none of the record citations in Plaintiff's Memorandum or 56.1 Statement provide any evidence to support that assertion. Moreover, Defendant has testified—and Plaintiff has not offered any evidence to the contrary—that each time BMS wished to use her sourcing services at Charkit, it was BMS that initiated the transaction, and that Defendant "never called or emailed, [or] contacted[] BMS to suggest that they purchase [a] particular product." (Def.'s Def. Dep. Tr. 163–64.)[11] Gossett corroborated this, specifying that it was "[his] job" to "initiate[] a purchase" and that Defendant never reached out to recommend purchasing any particular products. (Def.'s Gossett Dep. Tr. Excerpt 15–16.)

---

[11] According to Defendant, only six chemical products overlapped between the sales she made to BMS while working for Plaintiff and the sales she made to BMS while working at Charkit. (*Id*. at 163.) This makes sense, as Hinnant, Charkit's General Counsel, testified that Charkit primarily sells a different *type* of product to BMS than Plaintiff does. Hinnant affirmed that Charkit has only received and filled orders for intermediate chemicals from Gossett and has never sold any API products to BMS. (Hinnant Decl. ¶ 11.) Furthermore, Gossett testified that, although his purchases from Plaintiff have decreased over time, he still purchases materials from Plaintiff. (Def.'s Gossett Dep. Tr. 25–26.) Gossett stated that this was because BMS now has "[d]ifferent pipelines" with "different needs," leading him to conduct "less sourcing at this point in time," and for the additional reason that Defendant "provides better customer service." (*Id*. at 27.)

To the extent Plaintiff intends to argue that any of its customer contact information *itself* was a trade secret, this argument—by virtue of the Stipulation—is limited only to Defendant's relationship with BMS and any information she might have kept on her personal cellphone following her departure from Plaintiff, which is discussed in more detail in the subsequent subsection. (*See* Dkt. No. 57.) As to BMS, the record shows that Defendant's BMS contact, Gossett, reached out to Defendant via LinkedIn, a social media website and public platform, to which Defendant responded with her contact information at Charkit. (*See* Gossett LinkedIn Message.) Nothing in this exchange implicates the use of any trade secret at all. Subsequently, according to Gossett, he "message[d] [Defendant] to arrange a meeting to show what Charkit had to offer." (Def.'s Gossett Dep. Tr. Excerpt 20.) Gossett contacting Defendant at her new position at Charkit also did not implicate any of Plaintiff's purported trade secrets.[12]

As the movant, it is Defendant's burden to show that no genuine dispute of material fact exists or that there is a lack of evidence supporting certain material facts, but once that is accomplished, it is Plaintiff's burden to show that the record does indeed provide some evidence to support its position. *See Vieira v. United States*, No. 17-CV-10132, 2019 WL 6878807, at *1 (S.D.N.Y. Dec. 17, 2019) ("Where the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." (quoting *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993)) (alteration and quotation marks omitted)). "To defeat a motion for summary judgment, [a plaintiff] may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence in support of its factual assertions." *Edwards by Edwards v. City*

---

[12] In any event, the only *specific* item of trade secret information that Plaintiff has pointed to as to Defendant's relationship with BMS is the purchase summary list, not, for example, Gossett's contact information.

*of New York*, No. 15-CV-3637, 2019 WL 3456840, at *5 (S.D.N.Y. July 31, 2019) (quoting

*D'Amico v. City of New York*, 132 F.3d 146, 149 (2d Cir. 1998)) (citation and quotation marks

omitted).

Here, Plaintiff has only engaged in speculation and has made assertions with no record

support.  It may be true that in many trade secret cases, plaintiffs are forced to "construct a web

of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences,"

*ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13-CV-8645, 2017 WL 4403308, at *13

(S.D.N.Y. Oct. 2, 2017), but here, the record demonstrates none of the unlikely-to-be-

coincidental circumstances that typically create the possibility of such reasonable inferences.

For example, in *ScentSational*, the timing and content of certain publications issued by the

defendants, along with extensive evidence and testimony regarding the *content* of a meeting

where certain trade secrets were disclosed, led the court to conclude that there was enough

evidence for a "reasonable jury" to infer that the defendants had misappropriated trade secret

information.  *Id.* at *13–15.  Similarly, although in *Stanacard, LLC v. Rubard, LLC*, No. 12-CV-

5176, 2016 WL 462508 (E.D.N.Y. Feb. 3, 2016), there was no "direct evidence of

misappropriation," there were many more anchors upon which reasonable inferences of

misappropriation could be based, including a specific "list of the purported trade secrets that

were misappropriated" and similarities beyond a mere "overlap" in customer lists, such as "the

similar nature of the two companies' management consoles" and "referral programs."  2016 WL

462508, at *18–19.[13]

---

[13] Plaintiff's other cited cases on this point are also distinguishable.  *See Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 125 (E.D.N.Y. 1997) (granting preliminary injunction where the record indicated that the defendants had "intimate knowledge of the process of binding the magazines and of the needs and preferences of [the plaintiff's] customers," where one of the defendants "felt he could use that information freely," and where

Accordingly, the Court grants summary judgment to Defendant on Plaintiff's allegation that Defendant misappropriated trade secret information in securing business from BMS while working for Charkit. *See Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 171–72 (D. Conn. 2014) (granting summary judgment to the defendant on claim for misappropriation of confidential business information where the plaintiff "ha[d] not provided sufficient evidence" of the alleged misappropriation and noting that the "conclusory assertion" that "it would be impossible for [the plaintiff's] trade secret information . . . to not affect" the work of the individual who knew about the information was not enough to create a genuine dispute of material fact in the face of "evidence that . . . [the relevant project] did not relate to the creation or inclusion of the [confidential] elements,"); *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05-CV-9478, 2009 WL 399221, at *11 (S.D.N.Y. Feb. 18, 2009) (granting summary judgment to the defendant on claim for misappropriation of trade secrets where there was "no evidence" that the defendant "ever disclosed any of [the] trade secrets").

### 2. Misappropriation Through Defendant's Personal Cellphone

Plaintiff's position on Defendant's personal cellphone suffers from a similar flaw as its position on Defendant's relationship with BMS—that there is simply no evidence from which a reasonable jury could infer that Defendant improperly maintained and misappropriated any purported trade secret information on her personal cellphone.

---

the defendant "made representations . . . to the airlines that their *past expertise* would be used in formulating *competitive bids* and providing an identical product." (emphasis added)); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231–32 (W.D.N.Y. 1994) (discussing how a "comparison of the plaintiffs' and defendants' manufacturing techniques and single-screw compressor designs" provided "highly technical" proof and "strong circumstantial evidence of misappropriation").

In contrast, Plaintiff provides neither technical evidence implying the existence of misappropriation nor any evidence of Defendant making representations to BMS that she would use her expertise from working for Plaintiff in her new role at Charkit.

Klein, a senior compliance officer for Plaintiff, has testified that he inspected Defendant's cellphone upon her departure. (Cuthbertson Decl. Ex. D ("Def.'s Klein Dep. Tr. Excerpt") 10, 32 (Dkt. No. 70-5).) During that "standard" inspection, Klein deleted Defendant's work e-mail account and went "through the photos on [her cellphone] to see if there were any sensitive screen shots, things like labels or documents that might contain sensitive company information." (*Id*. at 32.) Klein stated that he "didn't see anything that raised any suspicion." (*Id*.) Indeed, Klein "did not have any evidence that [Defendant] had proprietary business contact information on her cell phone," and admitted that, even as he sat being deposed on March 16, 2018, he had "not seen any physical evidence" indicating otherwise. (*Id*. at 53.) Further, Defendant has averred under oath that, generally, she avoided saving business contacts on her personal phone while working for Plaintiff and preferred to search for contacts by searching her work e-mail function. (Def.'s Decl. ¶ 22.) To the extent any "minimal, stale [business] contact information" remained on her phone from her time working for Plaintiff, Defendant avers that she deleted it prior to appearing for Klein's inspection, in an effort to take "extra care" that she left Plaintiff "squeaky clean." (*Id*. ¶ 33 (quotation marks omitted).)

Plaintiff's Memorandum does nothing to rebut the lack of evidence regarding the existence of confidential business information on Defendant's personal cellphone. Plaintiff points to the fact that, Defendant occasionally used her personal cellphone for business purposes before she left the company, an option that she was, by Plaintiff's own admission, allowed to choose. (*See* Pl.'s Mem. 4–6.) Plaintiff also points out that Klein's review process of Defendant's cellphone may have taken only a few minutes and that Klein did not review Defendant's contact list. (*Id*. at 6–7; Pl.'s 56.1 ¶ 40.) Other than these two claims—which do not rebut any of Defendant's assertions—Plaintiff is unable to point to any evidence in the record

suggesting any details regarding what kind of information Defendant may have had on her phone, how, when, or where she used that information, or what suspicious events—other than her meeting with Gossett, discussed above—could give rise to any reasonable inferences that she misappropriated trade secret information that remained on her personal cellphone. (*See generally* Pl.'s Mem.)[14]

In sum, in the face of Defendant's Motion, Plaintiff has failed to offer *any* evidence, much less "hard evidence," and relies entirely on "mere conclusory allegations [and] speculation," which, at this stage of the litigation, is simply "not sufficient to . . . support [its] version of the events." *Edwards*, 2019 WL 3456840, at *5, 13 (relying on *D'Amico*, 132 F.3d at 145) (quotation marks omitted). No reasonable jury could infer from the record before the Court that Defendant misappropriated trade secret information from Plaintiff through her personal cellphone. *See Bulldog*, 8 F. Supp. 3d at 171 (noting that the plaintiff did not "provide[] sufficient evidence to demonstrate that there is a genuine issue of material fact regarding [the defendant's] claimed misappropriation"); *Metito*, 2009 WL 399221, at *13 (granting summary

---

[14] Plaintiff repeatedly points to two e-mail threads in the record that led it to believe that Defendant was "misappropriating and using" Plaintiff's proprietary information. (Pl.'s 56.1 ¶¶ 55–56; *see* Feb. 2017 E-mail Chain; Mar. 2017 E-mail Chain.) Plaintiff has used these e-mail chains as evidence before, when it sought a temporary restraining order and preliminary injunction against Defendant earlier in the case. However, as the Court pointed out at the Show Cause Hearing on that Application, the e-mails do not "reveal[] anything but the fact that there were e-mails inadvertently sent to [Defendant's] old e-mail address showing [Defendant] having e-mails or conversations with other companies about sodium salicylate out of China or India." (Hr'g Tr. 8.) Indeed, at the Hearing, Plaintiff's counsel himself acknowledged that the e-mails were "not dispositive of any issues," that there was no "explicit" disclosure of any trade secret information in those threads, and that the e-mails were "simply evidence that *something* might be going on," of which they could not be certain without discovery. (*Id*. at 8–10 (emphasis added).)
Now, after completing discovery, and nearly three years after commencing the Action, Plaintiff is still unable to point to any evidence, other than the purportedly "tip of the iceberg" e-mails, (*id*. at 8), that Defendant misappropriated anything, much less that Defendant specifically maintained and misappropriated confidential information on her personal cellphone.

judgment to the defendant on the misappropriation of trade secrets claim where there was "no evidence of any actual disclosure" of trade secret information).

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion. The Clerk of Court is respectfully requested to terminate the instant Motion, (Dkt. No. 66), enter judgment for Defendant, and close this case.

SO ORDERED.

Dated:      February 13 , 2020
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE